Filed 7/30/13  In re N.P. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re N.P. et al., Persons Coming Under the Juvenile Court Law. | B244508 <br><br> (Los Angeles County <br> Super. Ct. No. CK78413) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> Tamara S. et al., <br><br>     Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Philip L. Soto, Judge. Affirmed in part and reversed in part.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Defendant and Appellant Tamara S.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant Johnny P.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent Los Angeles County Department of Children and Family Services.

_____

Tamara S. ("Mother") and Johnny P. ("Father") appeal from the juvenile court's jurisdiction and disposition orders declaring Mother's two children dependents of the court pursuant to Welfare and Institutions Code[1] section 300, subdivision (b), removing them from the custody of Mother, and placing them in the homes of their respective fathers subject to court supervision. Mother argues the evidence was insufficient to support the jurisdictional finding based on her history of mental health issues. She also asserts the juvenile court erred in removing the children from her custody and in refusing to issue an order for informal case supervision. Father challenges the sufficiency of the evidence supporting the jurisdictional finding based on his history of drug use. He further contends the juvenile court abused its discretion in failing to terminate jurisdiction with a family law order, or alternatively, to issue an order for informal case supervision. We reverse the jurisdictional finding based on Father's drug use, but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Prior Child Welfare History

Mother has two children -- two-year-old N.P. (born October 2010) and one-year-old I.A. (born November 2011). Father, who resides in northern Los Angeles County, is the father of N.P., and Oscar A., who resides in Fresno County, is the father of I.A.[2] Mother previously had been a dependent child of the juvenile court based on sustained allegations of sexual abuse, general neglect, and caretaker incapacity. She emancipated from the dependency system in January 2010. Mother and Father had an approximately seven-month relationship from January to July 2010. Mother and Oscar had an approximately 10-month relationship from March 2011 to January 2012.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     Oscar, a non-offending parent, is not a party to this appeal.

In October 2010, the Los Angeles Department of Children and Family Services ("DCFS") received a referral alleging that Mother's history of mental health issues, including a diagnosis of bipolar disorder and 10 prior psychiatric hospitalizations, posed a risk of harm to her then newborn N.P. During the DCFS's investigation, additional allegations were raised about substance abuse problems on the part of both Mother and Father. In a December 2010 interview with the DCFS, Father admitted he had a history of marijuana use dating back to his senior year of high school. He reported that both he and Mother used the drug when they began their relationship in January 2010, and they also had tried ecstasy and methamphetamines on two occasions. Father denied he had used any illegal drugs since his relationship with Mother ended in July 2010, and he agreed to submit to a court-ordered case plan that would include random drug testing.

In January 2011, the juvenile court sustained a section 300 petition on the ground that Mother had a history of mental and emotional problems, including a diagnosis of depression, which rendered her unable to provide regular care for N.P. and placed the child at risk of harm. The court dismissed other counts in the petition pertaining to the parents' substance abuse history. Mother was ordered to complete individual counseling, a parenting course, and a substance abuse program with random drug testing, and to remain compliant with any prescribed medication. Father was ordered to complete a parenting course and random drug testing. N.P. was placed in the home of Father with monitored visitation for Mother. Father completed 20 sessions of a parenting course and 12 sessions of an anger management course. Mother completed 28 sessions of a parenting course, 19 sessions of individual counseling, and a substance abuse program. She also underwent a psychiatric evaluation in November 2011 and was diagnosed with borderline personality disorder, but was not prescribed any psychotropic medication at that time. In March 2012, the juvenile court terminated its jurisdiction and issued a family law order granting Mother and Father joint custody of N.P.

In January 2012, the Fresno County Child Protective Services received a referral alleging emotional abuse of I.A. by Mother and Oscar based on a physical altercation that occurred between them while I.A. was asleep in her crib. At the time of the investigation,

3

Mother had left Oscar's home in Fresno and moved back to Los Angeles. The agency deemed the allegation unfounded because there was no current risk of domestic violence in the child's home. Mother and Oscar initially shared custody of I.A., but Mother was awarded full custody of the child by a family law court in June 2012.

## II.    Initiation of Current Dependency Proceedings

The current matter came to the attention of the DCFS in July 2012 based on a referral alleging that I.A. had been bitten on her leg by N.P. and had suffered a minor burn on her arm while in Mother's care. The DCFS determined that the allegation of general neglect by Mother was unfounded due to the accidental nature of I.A.'s injuries. However, during the course of this investigation, the DCFS uncovered new allegations of caretaker incapacity based on Mother's mental health issues.

Specifically, in August 2012, Mother informed the case social worker that she had not been taking her prescribed medications, Wellbutrin and Abilify, for two weeks. According to Mother, her psychiatrist had directed her to stop taking the medications until certain blood work was completed. Mother's therapist, Allison Huber, identified Mother's current diagnosis as major depression with generalized anxiety disorder. Huber reported she did not have any concerns about Mother's cessation of medication because Mother checked in on a regular basis and her behaviors were consistent. Huber initially explained that Mother's psychiatrist wanted to ensure Mother had blood work done before prescribing new medication. However, the following week, Huber disclosed that Mother had been taken off her medications due to an overdose in July 2012. On that occasion, Mother took the remainder of her medications, which Huber believed consisted of five Wellbutrin and five Abilify pills. Mother's psychiatrist recently had placed her back on medication and prescribed 10 milligrams of Prozac for depression and anxiety. In discussing the July 2012 overdose with the case social worker, Mother denied she had attempted suicide. Mother stated that she took the pills because she was under stress and mistakenly thought that taking more would calm her down.

In an August 2012 interview with the DCFS, Oscar reported that Mother had attempted suicide on a prior occasion in December 2011 when she was residing with him in Fresno. Oscar had received a call from the local hospital that Mother had overdosed on acetaminophen with codeine after taking approximately 20 pills. Mother had been placed on a psychiatric hold following the overdose and then transferred to a behavioral health center. Oscar told the case social worker that he and Mother were no longer in a romantic relationship and he wanted to obtain full custody of I.A.

On August 20, 2012, a team decision meeting was held to address Mother's mental health history, recent suicide attempt, and ability to care for the children. According to the case social worker, Mother became defensive and uncooperative during the meeting. She minimized her past mental health issues and attempted to rationalize her recent overdoses by arguing that her children were not with her at the time. When Mother was informed that the DCFS intended to request a removal order, she became hysterical and tried to flee with I.A. before running out of the building on her own. The DCFS decided to release N.P. to Father and I.A. to Oscar. Father told the case social worker that his main concern when N.P. was in Mother's care was that he did not know where Mother would be on a day-to-day basis. Oscar reported that he was concerned any time I.A. was in Mother's care because when Mother was pregnant with I.A. and became angry, she had hit herself in the stomach.

### III.    Section 300 Petition

On August 23, 2012, the DCFS filed a section 300 petition alleging that Mother had mental and emotional problems, including major depression and anxiety, suicidal ideation, and a recent suicide attempt, which rendered her unable to provide regular care and supervision of her children and placed them at substantial risk of harm. The original petition did not contain any allegations concerning Father.

In response to the petition, Mother submitted an August 22, 2012 letter from her therapist, Huber. According to Huber, Mother began receiving mental health services at St. Anne's in November 2011, and began therapy with Huber in March 2012. Mother

had remained in regular contact with Huber, participated in therapy when feasible, and attended her psychiatric appointments. Mother also had been active in seeking out mental health and other services from Full Service Partnership, and her case recently had been assigned to the Hillsides Family Center in Los Angeles County.

At the August 2012 detention hearing, the juvenile court ordered the children detained from Mother and released to the custody of their respective fathers. The court granted Mother monitored visitation with the children at least three times per week. The court also directed the DCFS to address in its next report possible alternative resolutions to jurisdiction, including termination of the case with a family law order or a dismissal pursuant to section 301.

On September 26, 2012, the DCFS filed a first amended section 300 petition. The amended petition added an allegation that Father had a history of illicit drug use, including marijuana, which rendered him incapable of providing regular care and supervision of N.P. and placed the child at substantial risk of harm. In a September 2012 addendum report, the DCFS related that Father had failed two recent drug tests. Father tested positive for marijuana with a level of 728 ng/ml on August 21, 2012, and had a second positive test for marijuana with a level of 46 ng/ml on September 20, 2012. In a September 2012 interview with the DCFS, Father admitted to a history of marijuana use which had been addressed in the prior dependency case. Father also confirmed that he had used marijuana two weeks before submitting to a drug test in the current case. Father stated that he occasionally used marijuana when he went out, but denied he ever used it when N.P. was with him. Mother indicated that she and Father used drugs several years earlier, including "marijuana, coke, crystal and pills," and he still smoked marijuana. She also reported that Father did not take care of N.P., and instead gave full responsibility of caring for the child to his parents.

In its addendum report, the DCFS stated that it was concerned Father's drug use while N.P. was in his custody reflected a lack of parental availability and that his sharing of caretaking responsibilities with the paternal grandparents allowed him to take a less active role in the child's life. The DCFS noted that Father was willing to submit to

6

further drug testing to demonstrate his sobriety, and recommended that N.P. remain in Father's custody despite his history of drug use because he had a strong support system from his family. However, the DCFS wanted to continue supervising Father so that he could show his commitment to assuming the primary caretaking role in N.P.'s life and to meeting the child's needs without relying on his family for support.

## IV.    Jurisdiction/Disposition Report

For the September 28, 2012 Jurisdiction/Disposition Report, the DCFS conducted interviews with Mother, Father, and Oscar. Mother reported that she currently was under the care of a psychiatrist for depression and anxiety and was taking Prozac. She had been seeking treatment on her own for about a year and presently was receiving mental health services through Full Service Partnership. Mother admitted she had attempted suicide in December 2011 and on other prior occasions, but denied attempting suicide in July 2012. With respect to the December 2011 incident, Mother stated that she had post-partum depression following I.A.'s birth and had overdosed on her prescribed pain medication because she was feeling overwhelmed by life. Based on her doctor's advice, she was not taking any psychotropic medication at that time because she was breastfeeding, but she resumed her medication regimen in February 2012. With respect to the July 2012 incident, Mother indicated that she inadvertently had overdosed on her psychotropic medication when she took a bit more than the prescribed amount because she thought it would calm her down. She denied any other recent suicide attempts, or trying to harm herself when she was pregnant. Mother recently had been hired for her first job at a fast-food chain and was scheduled to start working in late September 2012.

Mother did not express any concerns about I.A.'s placement with Oscar and described him as a good father. She explained that, although Oscar relied on his family to care for I.A. while he was in school, he assumed full caretaking responsibility for the child when he was home. Mother had a cooperative relationship with Oscar and felt they could communicate about I.A. without involving the child's paternal grandparents. On the other hand, Mother was concerned about N.P.'s placement with Father because she

7

believed Father delegated all of his parental duties to the child's paternal grandparents. She also wanted Father to communicate with her directly about N.P. instead of deferring to his family. Mother was not opposed to a family law order granting custody of I.A. to Oscar, but she wanted to obtain full custody of N.P.

Father reported that Mother had disclosed her mental health history to him during their 2010 relationship. Although Mother had been prescribed psychotropic medication during that time, she did not take it. When Father ended their relationship in July 2010, Mother cut her wrists to the point of drawing blood and begged him not to leave. Father had limited contact with Mother since that time and difficulty communicating with her about custody issues. Father informed the DCFS that N.P. currently was doing well in his care. She slept through the night, spoke in simple English and Spanish words, and had a healthy appetite. During an inspection of the home Father shared with his parents, grandmother, and three siblings, the DCFS observed that N.P. was comfortable interacting with Father and other family members. The home itself was clean, free of clutter, and well-stocked with food. The DCFS was concerned, however, that N.P. slept with the paternal grandparents in their bed even though there was sufficient space for the child in Father's bedroom.

Oscar reported that Mother had a history of mental health issues during their 2011 relationship. When Mother was pregnant with I.A., she punched herself in the stomach, tried to jump out of a window, and threatened to commit suicide. Oscar did not observe Mother taking any psychotropic medication while she was living with him in Fresno, and he was unaware of Mother's mental health history until October 2011. Oscar confirmed that, in December 2011, Mother overdosed on her post-partum pain medication while I.A. was alone with her in the bedroom, which led to Mother being admitted to a mental health treatment facility. Their relationship ended in January 2012 and Mother returned to Los Angeles at that time. Oscar stated that he believed Mother was trying to be a good mother, but she could not take care of her children. During an inspection of the home Oscar shared with his parents and three siblings, the DCFS observed that the home was

clean, furnished, and stocked with baby supplies. I.A. slept in a crib in Oscar's bedroom and seemed very attached to her father.

For its report, the DCFS also spoke with Mother's therapists. Huber, the therapist who previously treated Mother, would not discuss Mother's mental health without a patient release, but stated that she did not have any concerns about Mother's parenting. Nicole Armas, the therapist who had been treating Mother for three weeks, reported that Mother was receiving intensive services through the Hillsides Family Center, which included individual and family counseling, 24-hour crisis intervention support, housing referrals, and transportation assistance. Mother had been seen by a staff psychiatrist and prescribed Prozac. As described by Armas, Mother was working to improve her coping skills, anger management, and depression during weekly in-home sessions. Armas was concerned about Mother's tendency to "play the victim," but explained that she was encouraging Mother to sustain her goals regardless of whether she was able to reunify with her children. Armas also noted that Mother had a strained relationship with the case social worker which resulted in Armas often needing to act as a mediator between them. In a separate letter dated September 21, 2012, Armas stated that Mother was attending individual therapy every week and was an engaged participant during each session. Armas had observed an exponential growth in Mother's character and coping skills as Mother had been able to develop insight into her behavior and to apply it to her daily choices. Armas opined that Mother had the proper motivation to continue pursuing therapeutic services and cultivating her coping skills.

With respect to visitation, the DCFS reported that Mother had made minimal effort to visit the children. The case social worker had arranged for visits to take place at the DCFS's Santa Clarita office which was a midpoint location for all parties. However, Mother did not attend scheduled visits with the children on August 29, 30, and 31, 2012, and then refused to further discuss visitation with the case social worker. Mother expressed concern that she was not given sufficient notice of the schedule and would have to travel five to six hours by bus to attend the visits. She also complained that the case social worker unreasonably had refused to assist her with transportation costs, and

9

conveyed that she did not plan to pursue further visits until her case was reassigned. Both Father and Oscar voiced concern about transporting their children over long distances to see Mother if she was not committed to attending the visits. They also confirmed that Mother had not contacted them about wanting to visit the children.

In its Jurisdiction/Disposition Report, the DCFS recommended that the children be declared dependents of the court and remain placed with their respective fathers, and that the parents be provided family maintenance or reunification services. The DCFS opined that a dismissal pursuant to section 301 was premature because Mother had attained only a short period of stabilization and needed to further demonstrate how she was benefiting from services given her past suicidal ideation and inconsistent treatment. The agency also noted that Mother needed to improve her level of communication and cooperation to arrange a suitable visitation schedule. However, the DCFS was concerned that the termination of jurisdiction with a family law order would not allow Mother a meaningful opportunity to reunify with the children. With respect to I.A., the agency observed that I.A. would benefit from a healthy relationship with both parents that could be fostered through further services. With respect to N.P., the DCFS reported that it continued to have concerns about Father's responsibility as a parent. The agency noted that the prior services had failed to resolve Father's substance abuse issues, and the parents' lack of communication impeded their ability to successfully co-parent N.P. The DCFS believed that continued jurisdiction with services for both Mother and Father would enable them to foster a cooperative environment that would benefit their child.

## V.     Jurisdiction and Disposition Hearing

At the September 28, 2012 hearing, Mother's counsel called two witnesses to testify—Liza Mutis, the dependency investigator, and Armas, Mother's current therapist. Mutis testified that the children were at risk of harm if released to Mother because of her history of mental health issues and two recent overdoses, which included one attempted suicide. Mutis noted that Mother's last overdose was in response to the stress of meeting with the case social worker, which Mutis believed showed there was a risk that Mother

would self-medicate with too many pills and be unavailable for the children when presented with a stressful situation. Mutis acknowledged that Mother was currently taking Prozac and regularly attending therapy, and opined that Mother was now connected to mental health services that could help her stabilize.

Armas testified that she had been treating Mother since August 2012. Armas saw Mother one to two times a week and spoke with her on the telephone two to three times a week. Armas stated that she had seen a lot of progress in Mother. Mother had grown in her goals, gained insight into her behavior, and shown that she was willing and able to change. Armas opined that Mother did not pose of a risk of harm to the children because she had spoken about how much she cared for the children and was committed to regaining custody of them in the future. Armas also believed that Mother was depressed, but was not suicidal. Armas acknowledged that Mother had self-medicated in July 2012, and that people who self-medicated by taking too many pills posed a risk of harm to small children in their care. Armas further admitted that she had not spoken with the children's fathers, had not observed Mother with the children, and did not know how Mother might respond to stress when the children were in her care.

Counsel for the DCFS and counsel for the children joined in submitting on the DCFS's recommendations in the Jurisdiction/Disposition Report. Mother's counsel argued that the section 300 allegations against Mother should be dismissed because Mother's current stability and compliance with mental health services showed that she did not pose a risk of harm to the children. Father's counsel argued that the section 300 allegations against Father should be dismissed because there was no evidence that Father's occasional use of marijuana outside the presence of N.P. posed a risk of harm to the child.

The juvenile court sustained the first amended section 300 petition as alleged. The court specifically found true the allegations that Mother's mental and emotional problems rendered her unable to provide regular care and supervision of N.P. and I.A., and that Father's history of illicit drug use rendered him unable to provide regular care and supervision of N.P. The court applauded Mother's efforts to address her mental health

11

issues, but noted that the children were very young and entirely dependent on others for their care. The court was concerned that there was a risk Mother would not be able to care for the children if she became overly stressed and took more than her prescribed dosage of medication. The court also was concerned that Father's marijuana use placed N.P. at risk of harm since the child could not protect herself from being exposed to marijuana smoke exhaled in her presence.

Proceeding to disposition, the juvenile court denied Father's requests to terminate jurisdiction with a family law order, or alternatively, to issue an order for informal supervision pursuant to section 360, subdivision (b). The court reasoned that Mother deserved an opportunity to rehabilitate herself and to regain joint custody of N.P. and I.A. given the children's age and Mother's own dependency history. The court also wanted the parents' compliance and progress with services to be closely monitored through formal supervision. The court declared N.P. and I.A. dependents of the court pursuant to section 300, subdivision (b), and ordered that the children remain placed in the homes of their respective fathers subject to court supervision. Father was ordered to complete a parenting course, submit to six consecutive random drug tests, and attend a drug rehabilitation program if he failed or missed a test. Mother was ordered to complete a parenting course, attend individual counseling to address case issues, and comply with her prescribed medication and therapy regimen. Mother also was granted monitored visitation with the children subject to the DCFS's discretion to liberalize. Following the hearing, both Mother and Father filed timely appeals from the juvenile court's jurisdiction and disposition orders.[3]

_____

[3] There have been two section 364 hearings in this matter since the notices of appeal were filed. At a March 2013 review hearing, the juvenile court continued its jurisdiction over both N.P. and I.A. and ordered that the children remain placed in the homes of their respective fathers with unmonitored visitation for Mother. At a May 2013 review hearing for N.P., the court continued its jurisdiction over the child without any changes in its placement or visitation orders, and set the matter for a further review hearing.

DISCUSSION

## I. Jurisdiction Order

On appeal, Mother and Father each challenge the sufficiency of the evidence supporting the juvenile court's jurisdictional findings under section 300, subdivision (b). For the reasons set forth below, we conclude that substantial evidence supported the jurisdictional finding based on Mother's mental health issues, but not the jurisdictional finding based on Father's drug use.

### A. Applicable Law

We review a juvenile court's jurisdictional findings for substantial evidence. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.) Substantial evidence is "evidence that is reasonable, credible, and of solid value." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401.) Under this standard of review, we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to the lower court on issues of credibility of the evidence and witnesses. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Tania S.* (1992) 5 Cal.App.4th 728, 733.) We determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order, resolving all conflicts in support of the determination and indulging all legitimate inferences to uphold the lower court's ruling. (*In re John V.* (1992) 5 Cal.App.4th 1201, 1212; *In re Katrina C.* (1988) 201 Cal.App.3d 540, 547.) If there is substantial evidence to support the juvenile court's order, we must uphold the order even if other evidence supports a contrary conclusion. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 251.)

Section 300, subdivision (b) provides that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

13

"The three elements for a section 300, subdivision (b) finding are: '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.' [Citation.] The third element . . . effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future . . . . [Citations.]" (*In re Savannah M.*, *supra*, 131 Cal.App.4th at pp. 1395-1396.) "Although evidence of past conduct may be probative of current conditions, the court must determine 'whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' [Citations.] . . . . There must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135-136; see also *In re Savannah M.*, *supra*, at p. 1397 ["purpose of section 300, subdivision (b) is to protect the child from a substantial risk of *future* serious physical harm . . . determined as of the time of the jurisdictional hearing"].)

### B.      Jurisdictional Finding Based on Mother's Mental Health Issues

The juvenile court sustained count b-1 in the amended petition as follows: "The children, [N.P.] and [I.A.'s] mother, [Tamara S.], has mental and emotional problems, including a diagnosis of [m]ajor depression and anxiety, suicidal ideation and a suicide attempt, which renders the mother unable to provide regular care and supervision of the children. In December 2011, and on prior occasions, the mother was hospitalized for the evaluation and treatment of the mother's psychiatric condition. The mother failed to take [her] psychotropic medication as prescribed. The child [N.P.] is a prior dependent of the [j]uvenile [c]ourt due to the mother's mental and emotional problems. Such mental and emotional problems on the part of the mother endanger the children's physical health and safety and place the child at risk of physical harm, damage and danger."

Mother argues that the evidence was insufficient to support the juvenile court's finding that her history of mental and emotional problems posed a substantial risk of harm to her children at the time of the jurisdiction hearing. It is true, as Mother asserts, that the DCFS had the "'burden of showing specifically how the minors have been or

14

will be harmed and harm may not be presumed from the mere fact of mental illness of a parent.'" (*In re James R.*, *supra*, 176 Cal.App.4th at p. 136; see also *In re Jamie M.* (1982) 134 Cal.App.3d 530, 542 [child welfare agency "must demonstrate with specificity *how* the minor has been or will be harmed by the parents' mental illness"].) In this case, however, the DCFS met its burden of showing that N.P. and I.A. remained at substantial risk of harm as a result of Mother's mental health issues.

The evidence presented at the jurisdiction hearing established that Mother had a history of attempting to harm herself during her pregnancies with N.P. and I.A. and following their births. In July 2010, while pregnant with N.P., Mother cut her wrists to the point of drawing blood following her break up with Father. In July 2011, while pregnant with I.A., Mother punched herself in the stomach, attempted to jump out of a window, and threatened to kill herself when she became upset at Oscar. In December 2011, shortly after I.A.'s birth, Mother attempted suicide by overdosing on her post-partum pain medication and was thereafter placed in a mental health treatment facility for several weeks. I.A. was alone with Mother in her room during the suicide attempt. In July 2012, Mother overdosed on her psychotropic medication by taking all of her remaining pills at one time. Although she denied attempting suicide on that occasion, Mother admitted the overdose was in response to the stress she felt during the DCFS's investigation. In August 2012, during a team decision meeting held to address Mother's ability to care for the children, Mother was defensive and uncooperative, minimized her most recent overdose and mental health issues, and attempted to flee with I.A. before running out of the building and onto the street.

Mother reasons that, as of the September 2012 jurisdiction hearing, there was no current risk of harm to the children because she was actively participating in mental health services, including taking her prescribed psychotropic medication and regularly attending therapy. Although Mother was being monitored by health care professionals and had made progress in addressing her mental health issues, she had attained only a very short period of stabilization at the time of the hearing. Additionally, Mother's December 2011 and July 2012 overdoses both occurred while she was under the care of

15

medical professionals, and in the case of the July 2012 overdose, while she was taking psychotropic medication. Thus, even when receiving mental health treatment, Mother had difficulty coping with the demands of life and had a recent history of responding to external stressors by self-medicating to the point of suffering an overdose. As Mother's therapist acknowledged at the jurisdiction hearing, people who self-medicated by taking too many pills posed an actual risk of harm to small children in their care. Based on the totality of the record, there was substantial evidence to support the jurisdictional finding that Mother's ongoing mental health issues rendered her incapable of providing her two young children with regular care and supervision, and accordingly placed them at substantial risk of serious physical harm.

### C. Jurisdictional Finding Based on Father's Drug Use

The juvenile court also sustained count b-2 in the amended petition as follows: "The child, [N.P.'s] father, [Johnny P.], has a history of illicit drug use, including marijuana, which renders the father incapable of providing regular care and supervision of the child. The father had a positive toxicology screening for marijuana on 8/21/2010. The father's illicit drug use endangers the child's physical and emotional health, safety and well-being, creates a detrimental home environment and places the child at risk of physical and emotional harm and damage."

Father contends that the evidence was insufficient to support the juvenile court's finding that his history of marijuana use posed a substantial risk of harm to N.P. As the DCFS correctly points out, "a jurisdictional finding against one parent is good against both." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) Stated otherwise, a child "is a dependent if the actions of either parent bring [the child] within one of the statutory definitions of a dependent. [Citations.] This accords with the purpose of a dependency proceeding, which is to protect the child, rather than prosecute the parent. [Citation.]" (*Ibid.*; see also *In re Alexis* (2009) 171 Cal.App.4th 438, 451 ["When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding

of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence."].)  In this case, because the jurisdictional finding as to Mother was supported by substantial evidence, it provides a sufficient independent basis for affirming the juvenile court's order of jurisdiction over N.P.  Nevertheless, because the jurisdictional finding as to Father could adversely affect him in future dependency proceedings, we agree with Father that his challenge to the sufficiency of the evidence supporting that finding is properly before us on appeal.

California courts repeatedly have recognized that a parent's use of marijuana or other illegal drugs, standing alone, is insufficient to support dependency jurisdiction under section 300, subdivision (b).  (*In re Drake M.* (2012) 211 Cal.App.4th 754, 764 ["the mere usage of drugs by a parent is not a sufficient basis on which dependency jurisdiction can be found"]; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003 [a parent's use of illegal drugs, "'*without more*,' does not bring a minor within the jurisdiction of the dependency court"]; *In re Alexis E.*, *supra*, 171 Cal.App.4th at p. 452 ["the mere use of marijuana by a parent will not support a finding of risk to minors"].)  Rather, to support a finding of jurisdiction based on a parent's drug use, the DCFS must "present evidence of a specific, nonspeculative and substantial risk to [the child] of serious physical harm."  (*In re Destiny S.*, s*upra*, at p. 1003.)  "Although 'even legal use of marijuana can be abuse if it presents a risk of harm to minors' [citation], a jurisdictional finding under section 300, subdivision (b), based merely on such usage *alone* without *any* evidence that such usage has caused serious physical harm or illness or places a child at substantial risk of incurring serious physical harm or illness is unwarranted and will be reversed."  (*In re Drake M.*, *supra*, at p. 769, fn. omitted.)

In *Drake M.*, for instance, the Court of Appeal reversed a jurisdictional finding that was based on a father's continued use of medical marijuana.  (*In re Drake M.*, *supra*, at pp. 757-758.)  As the court explained, there was no evidence that the father had a substance abuse problem as diagnosed by a medical professional or as defined in the Diagnostic & Statistical Manual of Mental Disorders.  The DCFS did not present any evidence that the father failed to fulfill his work obligations, suffered from substance-

17

related legal problems, drove his vehicle while under the influence of drugs, or continued to use drugs in the face of social or interpersonal problems caused by such use. (*Id*. at pp. 766-768.) Additionally, there was no evidence that the father was unable to adequately supervise or protect his child. Instead, the evidence showed that the child was healthy, was being well cared for by his parents, and had not been exposed to marijuana or second-hand marijuana smoke. (*Id*. at pp. 768-769.) Based on such record, the court concluded that Father's mere use of marijuana, without more, was insufficient to support a finding that his child was at substantial risk of harm. (*Id*. at p. 769; see also *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1346 [evidence was insufficient to support finding that mother's illegal use of marijuana created substantial risk of detriment to her children where there was no evidence that mother had displayed clinical substance abuse or been diagnosed with a substance abuse problem, and no testimony linking mother's marijuana use to her parenting judgment or skills].)

Here, the juvenile court's finding that Father's drug use posed a substantial risk of harm to N.P. was not supported by substantial evidence. While it was undisputed that Father had a history of using marijuana and experimenting with other illegal drugs, there was no evidence that Father was abusing drugs at the time of the jurisdiction hearing. The DCFS did not present any evidence that Father had been diagnosed with a substance abuse problem by a medical professional. Nor was there any evidence that Father displayed clinical symptoms associated with substance abuse, such as failing to fulfill his work obligations, driving under the influence of drugs, or suffering from any interpersonal problems as a result of his drug use. Rather, the evidence showed that Father had been gainfully employed for several years and lacked any criminal record. Father did admit to the DCFS in December 2010 that he had been a habitual user of marijuana and had tried other illegal drugs in the past, but he stated that he had stopped using any drugs a few months prior to N.P.'s birth and agreed to submit to a court-ordered case plan that included random drug testing. Two years later, after twice testing positive for marijuana in August and September 2012, Father admitted to the DCFS that he still occasionally used marijuana when he went out, but never in N.P.'s presence.

18

Although the DCFS opined that Father's current use of marijuana reflected a lack of responsible parental availability, the agency never claimed that N.P. was abused or neglected while in Father's care. To the contrary, after evaluating N.P. in the home that Father shared with his family, the DCFS found the child to be free from any signs of abuse or neglect. As the DCFS observed, the home itself was clean, free of clutter, and well-stocked with food. N.P. was affectionate toward Father and her paternal relatives, was developing appropriately, and appeared to be healthy and well-adjusted in his home. Despite Father's two failed drug tests and admitted recreational marijuana use, the DCFS recommended that N.P. remain in Father's custody given his strong familial support system. The DCFS did express concern that Father was relying too much on the parental grandparents for child care and other support, but the agency did not present any evidence linking Father's use of marijuana to a risk of serious physical harm to N.P.

In sustaining the dependency petition based on Father's history of drug use, the juvenile court reasoned as follows: "[T]hese are very young children. They are totally dependent on the adults that have them in their care. . . . They can't do anything on their own. They can't call for help. They can't run out into the street and try to find a neighbor. They can't protect themselves against any adverse situations such as marijuana smoke that may be exhaled in their presence. They can't do anything of those things." However, as one appellate court observed, while "it is possible to identify many possible harms that *could* come to pass" from a parent's drug use, "without more evidence than was presented in this case, such harms are merely speculative." (*In re David M.* (2005) 134 Cal.App.4th 822, 830.) Here, the juvenile court's stated concerns about N.P.'s potential exposure to marijuana smoke and lack of adequate supervision were not supported by any evidence in the record. While the record is unclear as to where Father was when he smoked marijuana, Father specifically stated that N.P. was not with him and was with the paternal grandmother, and that he never used drugs around the child. Furthermore, there was no evidence that Father ever left N.P. alone or without adequate adult supervision when she was in his custody. To the contrary, the DCFS noted that the paternal grandparents were actively involved in caring for N.P. and were able to preserve

the child's safety notwithstanding Father's marijuana use. Under these circumstances, there was no substantial evidence to support the juvenile court's finding that Father's history of drug use posed a substantial risk of serious harm to N.P.

## II.  Disposition Order

Mother and Father also raise challenges to the juvenile court's disposition order removing the children from Mother's custody and placing them in the homes of their respective fathers subject to court supervision. Mother contends that the evidence was insufficient to support a finding that removal of the children from her custody was the only reasonable means to protect them from harm. Father claims that the juvenile court erred in failing to terminate jurisdiction with a family law order granting him full custody of N.P., and in ordering him to submit to random drug testing as part of his family maintenance plan. Alternatively, both parents assert that the juvenile court abused its discretion in failing to issue an order for informal case supervision pursuant to section 360, subdivision (b). We conclude that none of these arguments has merit.

### A.  Order Removing the Children from Mother's Custody

Mother reasons that the removal order was not supported by substantial evidence because, at the time of the disposition hearing, she was being safely monitored by medical professionals and actively participating in mental health services to address any possible risk of suicidal ideation. Section 361, subdivision (c) permits the removal of a child from the custody of his or her parent if the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if he or she were returned home, and "there are no reasonable means by which the [child]'s physical health can be protected without removing" the child from the parent's custody. (§ 361, subd. (c)(1).) We review a juvenile court's dispositional findings for substantial evidence even where the burden of proof in the lower court is by clear and convincing evidence. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 916; see also *Sheila S. v. Superior Court*

20

(2000) 84 Cal.App.4th 872, 880 ["'clear and convincing' standard . . . is for the edification and guidance of the trial court and not a standard for appellate review'"].) In general, the juvenile court's "jurisdictional findings are prima facie evidence that the child cannot safely remain in the home. [Citation.] The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate. The focus of the statute is on averting harm to the child. [Citations]." (*In re Cole C.*, *supra*, at p. 917.)

Here, there was substantial evidence to support the juvenile court's finding that removal of N.P. and I.A. from Mother's custody was the only reasonable means to protect the children from harm. As discussed, at the time of the September 2012 jurisdiction and disposition hearing, Mother had achieved only a very short period of stabilization. In the two months prior to the hearing, Mother had overdosed on her prescribed psychotropic medication by taking all of her remaining pills at one time, and had an emotional breakdown at a team decision meeting when the DCFS explained that it intended to detain the children based on Mother's mental health issues. Additionally, there was evidence that Mother was not making a reasonable effort to visit the children in the month prior to the hearing. Of the three scheduled visits in late August 2012, Mother cancelled one visit the day before and simply did not show up for the other two visits. Even though I.A. had to be transported from Fresno to attend the visits in Los Angeles County, Mother complained that it was unfair that Mother had to travel so far to see the children for only a few hours. While transportation issues undoubtedly made it difficult for Mother to attend the visits, the record also reflects that Mother was being uncooperative and contributing to her lack of contact with the children by refusing to discuss a visitation schedule with the case social worker or to pursue any further visits until her case was reassigned.

It is true that, as of the disposition hearing, Mother had begun making progress in addressing case issues. She was under the care of a new psychiatrist, taking her prescribed psychotropic medication, and actively participating in therapy. Mother's current therapist had observed considerable growth in her character and coping skills,

21

and indicated that Mother had begun to apply the insight she gained in therapy to making better choices in her daily life. Mother's most recent efforts in seeking mental health services and complying with her treatment plan are commendable. Nevertheless, as the juvenile court noted, N.P. and I.A. are both very young and completely dependent on their caregivers to meet their basic needs. Given Mother's prior suicidal behavior and recent history of self-medicating to the point of overdose in response to stress, the juvenile court reasonably could conclude that Mother's mental health issues continued to pose a substantial risk of harm to her children and that such risk could only be obviated by removing them from her physical custody. The juvenile court's removal order was therefore supported by substantial evidence.

**B.      Order Placing the Children with their Fathers Under Court Supervision**

Both Mother and Father argue that the juvenile court erred in failing to select an alternative disposition to adjudicating the children dependents of the court and placing them in the custody of their respective fathers subject to the court's supervision. "The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.) The concept of best interest "'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' [Citation.]" (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

Under section 360, subdivision (c), once the juvenile court finds that a child is a person described by section 300, it may order and adjudge the child to be a dependent child of the court. (§ 360, subd. (c).) "If a child is adjudged a dependent child of the court . . ., the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child . . . ." (§ 362, subd. (a).)

Additionally, the court "may direct any and all reasonable orders to the parents . . . of the child who is the subject of any [dependency] proceedings . . . as the court deems necessary and proper to carry out the provisions of this section." (§ 362, subd. (c).) The reunification plan ordered by the court should be appropriate for each individual family based upon facts related to that family, and should be designed to eliminate the conditions that led to the dependency in the first instance. (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1229; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.) "Family reunification services play a 'crucial role' in dependency proceedings. [Citations.]" (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 563.) The law thus favors family reunification wherever possible. (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 59.)

As an alternative disposition, under section 360, subdivision (b), the juvenile court may, without adjudicating the child a dependent of the court, order that services be provided to keep the family together and place the family under the informal supervision of the child welfare agency. (§§ 360, subd. (b), 301.) Informal supervision may be appropriate "'if the family is cooperative and able to work with the social services department in a program of informal services without court supervision that can be successfully completed within 6 to 12 months and which does not place the child at an unacceptable level of risk.'" (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1259.) If informal supervision is ordered pursuant to [section 360, subdivision (b)], "'the court "has no authority to take any further role in overseeing the services or the family unless the matter is brought back before the court" pursuant to [section 360, subdivision (c)].'" (*Ibid*) As one appellate court has explained, "[w]hether to exercise this option under section 360, subdivision (b), is a discretionary call for the juvenile court to make; it may opt to do so, but it need not." (*In re N.M.* (2011) 197 Cal.App.4th 159, 171.)

Assuming that the child has been adjudged a dependent of the court, section 362.4 provides that, when the juvenile court terminates its jurisdiction over the child prior to the age of 18, the court "on its own motion, may issue . . . an order determining the custody of, or visitation with, the child." (§ 362.4.) The juvenile court accordingly is vested with broad discretionary authority to make a custody and visitation order in conjunction with

23

terminating its jurisdiction. (*In re Chantal S.* (1996) 13 Cal.4th 196, 203-204; *In re Roger S.* (1992) 4 Cal.App.4th 25, 30-31.) Such an order commonly is referred to as the "exit order" and remains in effect until modified or terminated by a family law court. (*In re John W.* (1996) 41 Cal.App.4th 961, 970.) The juvenile court's decision whether to terminate dependency jurisdiction and to issue an exit order is also reviewed for an abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300; *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1135.)

Contrary to the parents' arguments, the juvenile court did not abuse its discretion in declining to issue an order for informal supervision by the DCFS under section 360, subdivision (b). The record reflects that, prior to the disposition hearing, Mother had difficulty working with the DCFS on case issues. She has been uncooperative in a team decision meeting about the children's placement and in subsequent discussions about the visitation schedule, and rather than communicate directly with the case social worker, Mother often relied on her therapist to act as an intermediary between them. As of the disposition hearing, Mother was being more cooperative with the DCFS and receptive toward working with the agency to arrange a reasonable visitation schedule. However, in opposing a plan for informal services, DCFS noted that Mother still needed to improve her level of communication and cooperation with all parties. The agency also reasoned that, while Mother had taken a positive step toward reunification by actively participating in mental health services, she needed to demonstrate how she was benefiting from such services over a longer period given her prior inconsistency in maintaining treatment. In addition, the DCFS observed that Mother and Father had an ongoing conflict in their co-parenting relationship and that both parents needed to learn how to more effectively communicate with each other for their child's benefit. Based on this record, the juvenile court reasonably concluded that an order for formal supervision was warranted.

The juvenile court also did not abuse its discretion in denying Father's request to terminate dependency jurisdiction with a family law order granting him full custody of N.P. At two and a half years, N.P. is still a very young child who could benefit from a healthy custodial relationship with Mother. Prior to the children's removal from her

24

home, Mother shared joint custody of N.P. with Father. Although Mother's mental health issues rendered her incapable of providing N.P. with regular care as of the disposition hearing, Mother was receiving intensive mental health services through the Hillsides Family Center, including individual and family counseling, 24-hour crisis intervention support, housing referrals, and transportation assistance. As reported by her current therapist, Mother was committed to reunifying with her children, was actively participating in available services, and was making progress in addressing case issues. While Father was fortunate to have strong support from the paternal grandparents to help him provide N.P. with a stable home, Mother did not have the benefit of such familial support as evidenced by her own dependency history. However, she was benefiting from the mental health services she had begun to receive, and the DCFS determined that such services, if maintained, could help Mother reunify with her children in the future. Under these circumstances, the juvenile court reasonably concluded that continued jurisdiction over N.P. with family reunification services for Mother and family maintenance services for Father was in the child's best interest.

Finally, the juvenile court acted within its broad discretionary authority in ordering Father to submit to six consecutive random drug tests and to attend a drug rehabilitation program in the event of a failed or missed test.[4] Although Father was a non-offending parent for the reasons discussed above, the record reflects that he had a history of illicit drug use and that his continued use of marijuana during the current case was also illegal. Moreover, following his positive marijuana test in August 2012, Father indicated to the DCFS that he was willing to submit to further testing to prove that he was capable of remaining drug-free while N.P. was in his custody. Based on this record, the juvenile court reasonably could conclude that it was in the best interest of N.P. to require Father to abstain from recreational drug use while serving as the child's custodial parent, and to

---

**4** Father does not challenge the portion of the disposition order that directed him to attend a parenting education course, and thus, we need not address whether that aspect of Father's family maintenance plan was proper under the circumstances of this case.

demonstrate his continued sobriety through random drug testing.  The juvenile court's disposition order was not an abuse of discretion.

## DISPOSITION

The jurisdictional finding regarding Father's history of drug use as alleged in count (b)(2) of the first amended petition is reversed.  In all other respects, the juvenile court's jurisdiction and disposition orders are affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.

26